# In the United States Court of Federal Claims

No. 16-536
(Filed: October 25, 2021)

```
*****************************************
BALDI BROS, INC.,                       *
                                        *
                Plaintiff,              *
                                        *
        v.                              *        Contract Interpretation; Motion for
                                        *        Summary Judgment; RCFC 56(d).
THE UNITED STATES,                      *
                                        *
                Defendant.              *
*****************************************
```

*William Johan Braun*, Braun & Melucci, LLP, La Jolla, CA, counsel for Plaintiff.

*Vijaya Surampudi*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant.

## OPINION AND ORDER

**DIETZ, Judge.**

Construction contractor, Baldi Bros, Inc. ("Baldi"), sues the United States seeking compensation for an alleged constructive change to its contract with the Department of Navy ("Navy") after the Navy failed to provide Baldi with a Clean Soil Holding Area ("CSHA") for disposal of excess soil excavated during replacement of an aircraft ramp on Travis Air Force Base ("Travis AFB"). Before the Court are the government's motion for summary judgment, motion for a stay of further discovery, and motion to strike, and Baldi's Rule 56(d) motion to continue the summary judgment proceedings and motion to compel. For the reasons set forth in this opinion:

- Defendant's Motion for Partial Summary Judgment is **GRANTED**;[1]
- Plaintiff's Rule 56(d) Motion to Continue the Summary Judgment Hearing is **DENIED AS MOOT**;
- Defendant's Motion to Strike is **DENIED AS MOOT**;
- Defendant's Motion to Stay Discovery is **DENIED AS MOOT**; and
- Plaintiff's Motion to Compel is **DEFERRED**.

---

[1] The Court treats the government's motion for summary judgment as a motion for partial summary judgment because resolution of the CSHA requirement is not dispositive of all of Baldi's claims.

## I.   BACKGROUND

### A.   The Contract

On December 17, 2012, Baldi and the Navy entered a contract valued at $2,415,958 for removal and replacement of an aircraft ramp at Travis AFB (the "Contract"). Am. Compl. ¶ 4, ECF No. 18. The ramp replacement project called for "demolition of existing runway concrete, excavation of underlying soils, installation of new ramp pavement, storm drainage, under-drain system and incidental work[.]" *Id.* ¶ 5. The project required Baldi to excavate approximately 11,300 cubic yards of existing soil. *Id.* ¶ 6. In this regard, the Contract contained multiple sections setting forth specifications for the handling, testing, transportation, and disposal of excess soil. The specifications germane to this dispute are summarized below.

Section 1575, titled "Temporary Environmental Controls" ("Section 1575"), contains a specification for "Soil Management." Def.'s App. to Def.'s Mot. for Summ. J. at 091, 115, ECF No. 26-1 [hereinafter App.]. The specification provides that "[t]he contractor is responsible for management and disposal of all soil[.]" App. 115 (§1575.3.8(a) "Soil Management"). It further states that "Travis AFB *does not* have a *pre-approved* soil handling, staging, or containment area" and "[a]ll soil generated must be managed on the project site." App. 115 (emphasis added). Additionally, the contractor is required to segregate and stockpile "[s]oil known or suspected to be contaminated" separately from "clean soil." *Id.* (§1575.3.8(c) "Soil Management"). "Clean soil can be reused for backfill for the associated project site." *Id.* (§1575.3.8.1 "Backfill"). Under Section 1575.3.8.4, titled "Disposal" ("Paragraph 3.8.4"), when the contractor is disposing of "both waste and hazardous waste soil[,]" the contractor must take the soil "directly from the project site to an *approved* disposal facility." App. 116 (emphasis added).

Section 02111, titled "Excavation and Handling of Contaminated Materials" ("Section 02111"), states that "[t]he work shall consist of excavation and temporary storage of contaminated soil." App. 121 (§02111.1.5 "Description of Work"). This specification warns that the soil underlying portions of the ramp "is potentially contaminated with petroleum hydrocarbons resulting from surface fuel spill and leaks in the subsurface fuel distribution system." *Id.* Contamination with "chlorinated solvents," however, "is not anticipated." App. 121-22. This specification requires the contractor to characterize all excavated soil to "determine suitability for disposal at the Travis AFB Clean Soil Holding Area or an offbase landfill[.]" App. 123 (§02111.3.4 "Confirmation Sampling and Analysis"). Additionally, if contaminated soil is discovered, it "may be reused for backfill at the same location where it was removed, but it may not be spread around the construction site." App. 122 (§02111.2.1 "Backfill").

Section 02111.3.6.1, titled "Sampling of Stored Material" ("Paragraph 3.6.1"), states that "[s]amples of excavated soil will be collected to determine suitability for disposal at the Travis AFB [CSHA] or an offbase landfill." App. 124. To be considered suitable for disposal at the CSHA, soil must meet certain acceptance criteria, such as "no chlorinated/halogenated solvent contamination." *Id.* The criteria provide that clean soils "are acceptable at the CSHA without further testing[;]" soil with petroleum-only contamination "may also be accepted at the CSHA" depending on the level of contamination; and "soil with contaminant levels that exceed the maximum acceptable concentrations shall be disposed of at an offbase disposal facility." App. 124-25.

Section 02120, titled "Transportation and Disposal of Hazardous Materials" ("Section 02120"), sets forth "the potential requirements for transportation and disposal of hazardous material and non-hazardous petroleum-only contaminated soil." App. 130 (Part 1 "General"). This specification informs the contractor that "[h]azardous materials are not anticipated in the soil underlying the [ramp] pavement[;]" however, the soil "is potentially contaminated with non-hazardous petroleum hydrocarbons." *Id*. Section 02120.3.1, titled "On-Site Hazardous Waste Management ("Paragraph 3.1"), states that "[e]xcess clean soil and contaminated soil meeting acceptability criteria may be disposed at the Travis AFB [CSHA]." App. 136. "Excess clean soil and petroleum-only contaminated soil meeting acceptability criteria may be transported . . . without the requirements for offbase transportation and disposal of hazardous materials." App. 130 (Part 1 "General"). In contrast, "[e]xcess contaminated soil determined to be unacceptable for disposal at the CSHA will be removed from the Base under a manifest and disposed at a permitted disposal facility." App. 137 (§02120.3.2 "Off-Site Hazardous Waste Management").

In addition to the specifications mentioned above, there were two amendments to the solicitation that are also germane to this dispute. Amendment 4 replaced a 2004 map of Travis AFB that showed a CSHA location on Travis AFB with a 2007 map that did not show a CSHA location on Travis AFB ("Map Update"). App. 085-87. The Map Update also contained Note 9, which instructed that "[a]ll waste soil excavated shall be disposed of off-site in accordance with the specifications[.]" App. 087.

Amendment 5 incorporated the following pre-bid question and response from the Navy ("Pre-Bid Q&A"):

Q1:  Is the contractor required to dispose of excess soil off-site or will the Navy provide a dump location on-site? Also does the Navy have use for the existing aggregate base section, or is the contractor required to dispose of the material off-site?

A1:  All excess soil and excess existing base to be disposed of off-site.

App. 088.

**B.     The Dispute**

Prior to commencing the work, Baldi submitted a request for information asking the Navy to identify the location of the new CSHA on Travis AFB since Amendment 4 deleted the location of the CSHA. Am. Compl. ¶¶ 8-9. Baldi understood from the Contract that excess soil was to be disposed of "off-site," but Baldi interpreted "off-site" to mean "off the project site," not entirely off Travis AFB. *Id*. ¶ 9. Based on this interpretation, Baldi assumed that the Navy "would be setting up a new on-base CSHA for use for this project." *Id*. Contrary to Baldi's assumption, the Navy responded on July 17, 2013 as follows:

Travis AFB Clean Soil Holding Area referred to in spec 02111 and 02120 is no longer in service. In accordance with Pre-award Amendment 5 Question 1, all excess shall be disposed of off-site. Excavation, handling, sampling, transportation and disposal of

3

petroleum contaminated soil shall be in accordance with Spec 02111 and 02120. Survey, sampling and chemical analysis of soil shall be required to determine extent of contamination. Any fees associated with landfill charges for dismissal of contaminated soil is to be an added cost, pending CO.

*Id*. ¶ 8. Baldi "commented upon the government's RFI response by stating that a Request for Proposal (RFP) would need to be issued by the government for the survey, sampling, and chemical analysis of this soil." *Id*. ¶ 10.

On September 24, 2013, Baldi proceeded with submitting its first soil moving plan for removal of excess petroleum contaminated soil to the "yet-unidentified on-base CSHA site." Am. Compl. ¶ 11. The Navy rejected this plan on October 2, 2013 stating:

There are no designated waste disposal or spoil areas on site. In accordance with Plan Sheet G-4 Note 9 and Amendment 5 question 1, all excess waste soil needs to be disposed off site, whether satisfactory or unsatisfactory, contaminated or uncontaminated. Travis AFB does not have a pre-approved soil handing, staging or containment area. IAW Spec 01575 para 3.8b. The Travis AFB Clean Soil Handling Area shown on the original contract drawing G4 and described in specifications 02111 and 02120, was specifically removed from the project site when plan sheet G-4 was revised via Amendment 4. Location of disposal meeting all aforementioned contract requirements needs to be addressed.

*Id*. Baldi contends that contract performance was constructively suspended because of the Navy's refusal to provide an on-base CSHA. *Id*. ¶ 12. Two days after rejection of Baldi's first soil moving plan, the Navy informed Baldi that "the base is still investigating potential locations for clean soil disposal." *Id*. ¶ 13.

On October 30, 2013, Baldi re-submitted its soil moving plan, again specifying disposal of petroleum contaminated soil at an on-base CSHA. Am. Compl. ¶ 14. On November 12, 2013, the Navy again rejected the plan on the basis that the Contract did not require the Navy to provide a CSHA. *Id*. The rejection, however, did state that "due to the perceived benefit to the government and as a variation from contract requirements, an alternate location for excess soil disposal on government property is being considered." *Id*.

The Navy also informed Baldi on November 19, 2013 that Baldi was not allowed to transport any soil on-base without additional laboratory analysis. Am. Compl. ¶ 16. Baldi notified the government that it considered this testing to be a change to the contract requirements "since paragraph 3.6.1 of Section 02111 allowed petroleum contaminated soils of less than 1 part per million volume (ppmv) to be received at the CSHA without further testing." *Id*.

On December 24, 2013, Baldi informed the government that it considered the work constructively suspended based on the government's prior assurances that it was considering establishing an on-base disposal site. Am. Compl. ¶ 17. The Navy responded nearly a month later informing Baldi that "the government does not have a CSHA and disposing of excess soil off-site along with required testing is the responsibility of the contractor." *Id*. Baldi interpreted this response as a directive to locate an offbase disposal site and proceed with the work under protest. *Id*. In compliance with this directive, Baldi submitted a revised soil moving plan, which

4

identified a private, offbase landfill for disposal of petroleum contaminated soil. *Id*. ¶ 18. This revised plan was approved by the government on February 5, 2014. *Id*.

A couple months later, Baldi received test results from its soil testing laboratory that "showed that soils in certain areas were contaminated with heavy metals," contrary to the Contract specifications. Am. Compl. ¶ 19. After meeting with the Navy, Baldi proposed that "heavy metal contaminated soil . . . be utilized as on-site backfill and that only petroleum contaminated soils be hauled off-site." *Id*. The Navy agreed with this proposal, and Baldi proceeded with burying the heavy metal contaminated soil at the project site and hauling the petroleum contaminated soils to its offbase disposal site. *Id*. Baldi contends that the constructive suspension was lifted after it received a signed manifest from the Navy allowing Baldi to haul petroleum contaminated soil to its offbase disposal site. *Id.* ¶ 20.

Baldi completed all soil hauling by October 14, 2014 at a cost of $116,905.50 in trucking fees and $75,204.24 in disposal fees. Am. Compl. ¶ 21. All work under the Contract was completed on May 28, 2015, which was 178 days after the contract completion deadline of December 1, 2014. *Id*. ¶ 22. As a result of the delayed completion, the Navy assessed a per-day late penalty totaling $344,608 against Baldi under a liquidated damages clause in the Contract. *Id*.

## C.     Procedural History

After completing the project, Baldi submitted a claim to the Navy in the amount of $253,424.31 pursuant to the Contract Disputes Act of 1978 ("CDA"). Am. Compl. ¶ 26. Baldi sought compensation under Federal Acquisition Regulation ("FAR") 52.243-2, *Changes*, for its "increased direct costs of disposing of the contaminated soils off-base." *Id*. The Navy Contracting Officer denied Baldi's CDA claim on February 24, 2016. *Id*.

Baldi filed its complaint in this Court on May 2, 2016. Compl., ECF No. 1. After filing its complaint, Baldi submitted a second CDA claim to the Navy seeking "recission of the liquidated damages, a 178 day contract time extension, extended field overhead and general conditions, and under-absorbed home office overhead compensation." Am Compl. ¶ 32. The Navy Contracting Officer also rejected Baldi's second CDA claim. *Id*.

Baldi then filed an amended complaint to add its second CDA claim. *See generally* Am. Compl. ¶¶ 30-35. The government filed its answer to Baldi's first amended complaint and included a counterclaim to retain the liquidated damages withheld from Baldi. Answer to Am. Compl., ECF No. 19.

The government proceeded to file a motion for summary judgment arguing that the Contract does not require the government to provide Baldi with a CSHA, or, alternatively, that any ambiguity regarding the government's obligation to provide a CSHA was a patent ambiguity that should be interpreted against Baldi. Def's Mot. for Summ. J. at 1, ECF No. 26 [hereinafter MSJ]. The government also asserts that all of Baldi's claims are premised on a requirement in the Contract that the government provide a CSHA, and that therefore, granting the government's motion for summary judgment on the CSHA requirement is entirely dispositive of Baldi's

claims. *Id.* at 2. The government states that the only issue is interpretation of the Contract, which is a legal issue that requires no further discovery for resolution. *Id.* at 4-5. The day after filing its motion for summary judgment, the government filed a motion to stay further discovery while its motion for summary judgment was pending. *See generally* Def.'s Mot. to Stay Disc., ECF No. 27 [hereinafter Mot. to Stay].

In its opposition to the government's motion for summary judgment, Baldi argues that the Contract unambiguously requires the government to provide Baldi with a CSHA. Pl.'s Opp'n to Summ. J. at 3, ECF No. 38 [hereinafter Pl.'s Opp'n to MSJ]. Baldi further argues that, if the Court finds the Contract to be ambiguous on the government's obligation to provide a CSHA, extrinsic evidence should be allowed to resolve the ambiguity. *Id.* Baldi contends that the government's motion seeks only partial summary judgment because resolution of the CSHA requirement is not entirely dispositive of Baldi's claims. *Id.* at 11. Baldi requests that, if the Court finds the Contract ambiguous and allows for discovery, the Court continue the motion for summary judgment pursuant to Rule 56(d) of the Rules of the Court of Federal Claims ("RCFC") until completion of discovery. *Id.* at 20-22. Baldi also filed a motion to compel production of documents and oral depositions to obtain extrinsic evidence to assist with interpretation of the Contract and address the government's motion for summary judgment in the event the Court finds the Contract to be ambiguous. *See generally* Pl.'s Mot. to Compel, ECF No. 28 [hereinafter Mot. to Compel].

In support of its opposition, Baldi filed a sworn declaration by Michael Baldi, the President of Baldi Bros, Inc. ECF No. 38-1 [hereinafter Baldi Decl.]. Baldi references the declaration throughout its opposition brief. *See* Pl.'s Opp'n to MSJ at 3-6, 18. Shortly after Baldi filed its opposition, the government filed a motion to strike paragraphs 5 through 9 from the declaration. Def.'s Mot. to Strike, ECF No. 43 [hereinafter Mot. to Strike]. These paragraphs relate to Baldi's performance under prior paving contracts at Travis AFB. *See id.* at 1. The government argues that these paragraphs should be stricken because Baldi failed to timely disclose during discovery that it intended to rely on the government's prior course of dealing under previous paving contracts. *Id.* at 5.

The Court held a discovery hearing on the outstanding discovery motions on June 27, 2018, ECF No. 47, and oral argument on the motion for summary judgment on July 15, 2021, ECF No. 67. The Court now considers the government's motion for summary judgment and the outstanding discovery motions.[2]

## II.   THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

The parties offer conflicting interpretations of the Contract. The government argues that the Contract is unambiguous in that it does not require the government to provide Baldi with a CSHA, and, alternatively, if the Court were to determine that the Contract is ambiguous on the CSHA requirement, it is a patent ambiguity that must be construed against Baldi. In opposition, Baldi argues that the Contract unambiguously requires the government to provide a CSHA, and, alternatively, if the Court determines that the Contract is ambiguous on the CSHA requirement,

---

[2] This case was reassigned to the undersigned on January 5, 2021. Notice of Reassignment, ECF No. 63.

the Court should continue summary judgment proceedings and allow extrinsic evidence to resolve the ambiguity.[3] For the reasons explained below, the Court finds no dispute of material fact and grants the government's motion for partial summary judgment.

### A.    Legal Standards

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Castillo v. United States*, 952 F.3d 1311, 1319 (Fed. Cir. 2020). An issue is genuine if it "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. A fact is material if it might impact the outcome of the suit under the governing law, while disputes that are irrelevant or unnecessary will not preclude summary judgment. *Id.* at 248. The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, which, if satisfied, shifts the burden to the non-moving party to show that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The Court must draw all inferences from the underlying facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the Court must not weigh the evidence or make findings of fact. *See Anderson*, 477 U.S. at 249; *see also Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment.").

Contract interpretation is usually a question of law "generally amenable to summary judgment." *Varilease Tech. Grp., Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002). However, sometimes contract interpretation requires findings of fact, such as determining the parties' intent, to resolve ambiguous contract language. *See Perry-McCall Constr., Inc. v. United States*, 46 Fed. Cl. 664, 672 (2000) (citing *Sylvania Elec. Products, Inc. v. United States*, 458 F.2d 994, 1005 (Ct. Cl. 1972)). If the court must hear extrinsic evidence regarding the intent of ambiguous contract terms, the dispute is not amenable to summary judgment. *See Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1183 (Fed. Cir. 1988); *see also Cray Rsch., Inc. v. United States*, 41 Fed. Cl. 427, 439–40 (1998).

An ambiguity exists when there is more than one reasonable interpretation of a contract. *King Fisher Co. v. United States*, 51 Fed. Cl. 94, 99 (2001) (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996)). Whether a contract provision is ambiguous is also a question of law. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). The ambiguity must be more than the parties simply disagreeing in their respective interpretations of a contract term. *See Metric Constructors v. Nat'l Air & Space Admin*., 169 F.3d 747, 751 (Fed. Cir. 1999); *Enron Fed Sols., Inc. v. United States*, 80 Fed Cl. 382, 393 (2008) ("The mere fact that the parties disagree with regard to the interpretation of a specific provision, does not, standing alone, render that provision ambiguous.") (citing *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993)). To be ambiguous, differing interpretations must fall within the "zone of reasonableness." *Metric Constructors*, 169 F.3d at 751.

---

[3] Baldi filed an opposition to the government's motion for summary judgment but did not file a cross-motion for summary judgment. *See* Pl.'s Opp'n to MSJ. Since Baldi does not move for summary judgment, Baldi only needs to raise disputes as to material facts and does not need to show there is no genuine dispute of material fact in Baldi's favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

**B.    Discussion**

Baldi claims that the Contract required the government to provide a CSHA for performance of the ramp replacement project and that the government's failure to provide a CSHA constituted a constructive change to the Contract. However, the Court finds that Baldi's interpretation of the Contract is contrary to its plain language, which unambiguously does not obligate the government to provide a CSHA. Alternatively, even if the Court were to find Baldi's interpretation reasonable and the Contract to be ambiguous on the CSHA requirement, it would result in a patent ambiguity that would be resolved against Baldi.

### 1.    The plain language of the Contract does not create an obligation for the government to provide a CSHA.

When interpreting a contract, "the Court must start with the plain meaning of the [c]ontract's text." *Enron Fed. Sols.*, 80 Fed. Cl. at 393. The terms of the contract are given "their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Harris v. Dep't of Veteran Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998). Additionally, a contract should "be considered as whole and interpreted so as to harmonize and give reasonable meaning to all its parts." *NVT Techs*, 370 F.3d at 1159. The contract language "must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Metric Constructors*, 169 F.3d at 752 (quoting *Hol-Gar Mfg. Corp. v. United States*, 169 Cl. Ct. 384, 351 (1965)). "When the contract language is unambiguous on its face, our inquiry ends, and the plain language of the contract controls." *Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002).

The Court finds that the plain language of the Contract does not obligate the government to provide Baldi with a CSHA. The Contract is clear that there was no CSHA at Travis AFB at the time of contract formation and that the contractor was required to dispose of excess soil. Paragraph 3.8 states that the "contractor is responsible for management and disposal of all soil[.]" App. 115. Paragraph 3.8.4 requires that the contractor dispose of "both waste and hazardous waste soil . . . directly from the project site to an *approved disposal facility*." App. 116 (emphasis added). Paragraph 3.8(b) explicitly states that "Travis AFB *does not* have a pre-approved soil handling, staging or containment area." App. 115 (emphasis added). When read together, the plain language of these sections makes clear that the contractor is responsible for disposal of soil, the contractor is required to haul waste and hazardous waste soil from the project site to an approved disposal facility, and Travis AFB does not have a pre-approved CSHA. Such a reading of this plain language is reinforced by the Map Update, which entirely removed the CSHA location from the Travis AFB map, and Pre-Bid Q&A, which instructed potential contractors that all excess soil was to be disposed of off-site. *See* App. 087-88.

Baldi relies heavily on Paragraph 3.6.1 to argue that the Contract created an obligation for the government to provide a CSHA. Baldi cites to a portion of Paragraph 3.6.1 that states "[s]oil with petroleum-only contaminated [*sic*] *may be accepted at the CSHA* if . . . specific acceptance criteria are satisfied." App. 124 (emphasis added); *see* Pl.'s Opp'n to MSJ at 14. Baldi interprets this sentence to mean that "excess petroleum contaminated soils *could be* disposed of 'on-base' at the [CSHA]," or, in other words, if the soil met the acceptance criteria,

the government *would* accept the soil at the on-base CSHA. Am. Compl. ¶ 6; Pl.'s Opp'n to MSJ at 14. This interpretation, however, is contrary to the plain meaning of the language. The clause "may be accepted at the CSHA" as used in Paragraph 3.6.1 denotes that the government has discretion to "accept" soil at the CSHA. There is no explicit requirement that the government provide a CSHA. Paragraph 3.6.1 is contained within a section with specifications for "[s]ampling of [s]tored [m]aterial." *See* App. 124-27. A reasonable interpretation of this section involves Baldi sampling the soil to determine if the soil meets the acceptability criteria for disposal at the CSHA, and the government determining whether to accept such soil. If the CSHA happens not to be available for use by the contractor, the government retains the discretion, as the party doing the *accepting*, to reject the soil and instruct the contractor to dispose of the soil at another approved location. Since the government has discretion to accept or reject soil, Paragraph 3.6.1 cannot be reasonably interpreted to obligate the government to provide a CSHA.

Binding precedent supports this interpretation. In *Chris Berg, Inc. v. United States*, the Court of Claims, the predecessor to this Court, found that the government was not obligated to repair a tramway for use by the contractor in performance of a government contract because the contract stated that the tramway "may be used," which the Court found "refers merely to permissive use and not to any specific suitable or intended use" guaranteed by the government. *Chris Berg, Inc. v. United States*, 389 F.2d 401, 405 (Ct. Cl. 1968). The Court of Claims reached a contrary conclusion in *S.S. Mullens, Inc. v. United States*, which serves as a companion case to *Chris Berg* because it involves "much the same kind of performance, in the same part of the world, in support of the same program." *See id.* at 402. In *S.S. Mullens*, the Court of Claims found that the government's failure to repair a tramway constituted a breach because, in addition to the "may be used" clause, the contract contained a government furnished property clause—which was absent from the contract in *Chris Berg*—that provided a more definite statement of guarantee. *S.S. Mullens, Inc. v. United States*, 389 F.2d 390, 397-98 (Ct. Cl. 1968). The government furnished property clause in *S.S. Mullens* stated, as summarized by the Court of Claims, that "[i]n case [g]overnment furnished material set forth in the specifications (this included the tramway) was not 'suitable for the intended use' the contracting officer was to make an 'equitable adjustment' under the 'Changes' article." *Id.* at 393. Although *Chris Berg* and *S.S. Mullens* address express warranties for the provision of government property, the Court finds these cases instructive. These cases interpret contract clauses providing that certain government property "may be used" by the contractor in performance of the contract work similar to Paragraph 3.6.1 in the instant case, which provides that excess soil "may be accepted at the CSHA." Consistent with the findings in these cases, the clause "may be accepted" as used in Paragraph 3.6.1 is not enough by itself to give rise to a contractual obligation for the government to provide a CSHA to Baldi.

The use of "may" in Paragraph 3.6.1 is also distinguishable from its use in Section 02120.3.1 ("Paragraph 3.1"), which states "[e]xcess clean soil and contaminated soil meeting acceptability criteria *may be disposed* at the Travis AFB [CSHA]." App. 136 (emphasis added). In this context, as the party doing the "disposing," Baldi has discretion whether to dispose of soil at the CSHA. However, even in this context, the clause "may be disposed" merely provides Baldi with permission to use the government furnished CSHA. It does not extend to obligate the government to provide a CSHA or otherwise guarantee that the government CSHA will be

operational or available for use by Baldi during contract performance. *See Chris Berg*, 389 F.2d at 405.

The plain language of Note 9 and the Pre-Bid Q&A, likewise, are insufficient to create an obligation for the government to provide Baldi with a CSHA. Baldi argues that the term "off-site" as it is used in Note 9 and the Pre-Bid Q&A means "off the project site," not entirely "off-base." *See* Pl.'s Opp'n to MSJ at 14-15. Through a plain reading, the term "off-site" in Note 9 and the Pre-Bid Q&A could reasonably be interpreted to mean two different things: off of the project site (but still on Travis AFB) or off of Travis AFB entirely. While this arguably creates ambiguity, the plain language of the Contract resolves any such ambiguity. The Contract explicitly states that Travis AFB does not have a pre-approved CSHA. *See* App. 115. Without a pre-approved on-base CSHA, the use of "off-site" in Note 9 and the Pre-Bid Q&A could only mean a disposal location off of Travis AFB entirely. This meaning is reinforced by the fact that Note 9 was incorporated into the Contract as part of the Map Update—which entirely removed the Travis AFB CSHA and left the Contract with no designated on-base location for disposal of excess soil. App. 087. Additionally, following the Map Update, a contractor other than Baldi inquired about disposal of excess soil, and the Navy responded by stating that "all excess soil and excess existing base [is] to be disposed of off-site." App. 088. When these parts of the Contract are read together, the term "off-site" must logically mean off of Travis AFB entirely. While it was always possible that the Navy would identify a new CSHA for on-base disposal of soil during contract performance, nothing in the Contract obligated the government to do so.

Baldi also argues that reference to "the specifications" in Note 9 supports an interpretation that the government is required to provide a CSHA. Note 9 states that "[a]ll waste soil excavated shall be disposed of off-site in accordance with the specifications[.]" App. 087. Baldi argues that "the specifications" refers solely to Paragraph 3.6.1, which was not modified as part of Amendment 4 and, as Baldi argues, obligates the government to identify a new CSHA. Pl.'s Opp'n to MSJ at 14-15. As explained above, however, Paragraph 3.6.1 does not obligate the government to provide a CSHA. Further, the reference to "the specifications" in Note 9 does not exclusively refer to Paragraph 3.6.1 but, to the contrary, refers to all of the specifications in the Contract, including Paragraph 3.8. The plain language of Paragraph 3.8 and its subparagraphs provides that the contractor is responsible for disposal of soil, Travis AFB does not have a pre-approved CSHA, and the contractor would need to haul waste and hazardous waste soil from the project site to an approved disposal facility. *See* App. 115-16. The plain language of Note 9— when viewed in context of all of the clauses in the Contract—does not support Baldi's interpretation that the government is contractually obligated to provide Baldi with a CSHA.

## 2. Even if the Court were to find the Contract ambiguous on the CSHA requirement, the ambiguity would be a patent ambiguity.

The Court, as explained above, finds that the Contract is unambiguous in that it does not obligate the government to provide a CSHA. However, even if the Court were to find Baldi's interpretation to be reasonable and the Contract to be ambiguous as to whether the government was obligated to provide a CSHA, the ambiguity would be a patent ambiguity that would be resolved against Baldi because Baldi failed to inquire about inconsistencies in the Contract.

Patent ambiguities are ambiguities that are so "patent and glaring" that it is unreasonable for a contractor not to discover and inquire about them. *Beacon Constr. Co. of Mass. v. United States*, 314 F.2d 501, 504 (Cl. Ct. 1963). The existence of a patent ambiguity triggers a contractor's duty to inquire about the ambiguity. *See Triax Pac., Inc. v. West*, 130 F.3d 1469, 1474-75 (Fed. Cir. 1997). Absent an inquiry from a contractor, patent ambiguities are resolved against the contractor. *Id*. at 1475. The test for a patent ambiguity is objective—the inquiry is whether the contract "contains facially inconsistent provisions that would place the reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." *Nielson-Dillingham Builder, J.V. v. United States*, 43 Fed. Cl. 5, 11 (1999). A patent ambiguity is usually noticeable on the face of the contract without requiring extrinsic evidence. *See Triax*, 130 F.3d at 1475 (holding that the presence of a patent ambiguity is determined by "what a reasonable contractor would have perceived in studying the bid packet").

In the immediate case, any reasonable contractor believing that the government was required to provide a CSHA would have identified glaring inconsistencies on the CSHA requirement and, as a result, would have inquired whether the government was going to provide a CSHA. An interpretation that the government was required to provide a CSHA facially conflicts with several provisions of the Contract. Paragraph 3.8 explicitly states that the "contractor is responsible for management and disposal of all soil" and goes on to state in Paragraph 3.8(b) that "Travis AFB *does not* have a pre-approved soil handling, staging or containment area." This Contract language alone is sufficient to warrant an inquiry by the contractor to confirm whether the government will provide a CSHA, but the amendments to the solicitation make the inconsistencies even more glaring.

Amendment 4 entirely removed the CSHA location from the Travis AFB map. If a contractor was preparing its bid under an assumption that the government would provide a CSHA at no cost, the complete removal of the CSHA location from the Travis AFB map, without a placeholder or other indication that the government intended to identify a new CSHA location, would cause a reasonable contractor to inquire during the bidding process about the CSHA. *See* App. 087. Adding weight to this conclusion, the Contract suggests that a contractor other than Baldi *did* inquire about the availability of a CSHA. In the Pre-Bid Q&A, a contractor asked: "Is the contractor required to dispose of excess soil off-site, or will the Navy provide a dump location on-site?" App. 088. The government responded by stating "[a]ll excess soil and excess existing base to be disposed of off-site." *Id*. This response only highlights the inconsistencies that a reasonable contractor, believing that the government was required to provide a CSHA, would have noticed.

Furthermore, the relative magnitude of the soil handling and disposal scope to the overall ramp replacement project supports a conclusion that a reasonable contractor would have inquired whether the government intended to provide a CSHA at no cost. The Contract contemplated removal of 11,300 cubic meters of soil. *See* Am. Compl. ¶ 6. The increased costs from hauling the soil to a private disposal facility increased the overall contract price by approximately ten percent. *See* Am. Compl ¶¶ 4, 27. Under these circumstances, a reasonable contractor would not have proceeded with its proposal without first seeking a clarification or confirmation from the government on whether a CSHA would be provided at no cost. *See Gelco Blds. & Burjay Constr. Corp. v. United States*, 369 F.2d 992, 1031 (Cl. Ct. 1966) (finding a duty to inquire when the

contractor sought compensation of over $385,000 for alleged extra work under a $2,200,000 contract).

### C.    Conclusion

For the reasons explained above, the Court finds that the plain language of the Contract is unambiguous in that it does not obligate the government to provide Baldi with a CSHA. Baldi has not identified, nor has the Court found, any contractual provision that imposes such an obligation on the government. Accordingly, there is no genuine dispute of material fact, and the government's motion for summary judgment on the CSHA requirement is granted.

Alternatively, even if the Court were to find that Baldi's interpretation of the Contract was reasonable and the Contract is ambiguous on the CSHA requirement, the ambiguity would be patent. Baldi had a duty to inquire and failed to make such an inquiry. As a result, such an ambiguity would be resolved against Baldi.

The government argues that granting summary judgment in its favor on the CSHA requirement entirely disposes of Baldi's claims. *See* Def.'s Reply at 20-21, ECF No. 42. The Court disagrees. Baldi's first claim is based entirely on resolution of the CSHA requirement, however, Baldi's second claim seeks recission of the liquidated damages assessed for late completion of the project on the ground that Baldi is entitled to compensable delays. *Compare* Am. Compl. ¶ 28, *with id.* ¶ 31. Some of the compensable delays alleged by Baldi arise from "the requirement that a Soil Tracking Form be use[d] and [Baldi] comply with [the] Base Soil Management Procedures Manual[;]" "that additional soil testing be performed prior to hauling of contaminated soils on base roads[;]" and the "delay in issuing a signed manifest allowing the hauling of petroleum contaminated soils on-base." Am. Compl. ¶ 31. These claims are arguably independent of the CSHA requirement and further proceedings may be required to reach full resolution. Accordingly, in granting the government's motion for summary judgment, the Court treats the government's motion as a motion for partial summary judgment.

## III.   OTHER OUTSTANDING MOTIONS

### A.    RCFC 56(d) Motion to Continue Summary Judgment Proceedings

As part of its opposition to the government's motion for summary judgment, Baldi requests that the Court defer considering the motion for summary judgment under RCFC 56(d) until Baldi is given the opportunity to conduct further discovery "[i]n the event that the Court finds the CSHA provision ambiguous." Pl.'s Opp'n to MSJ at 20. RCFC 56(d) provides that the Court may defer or deny a motion for summary judgment if the nonmovant shows that it cannot present facts essential to justify is opposition. Since both grounds on which the Court grants the government's motion for summary judgment are based on the plain language of the Contract, further discovery will not engender a genuine issue of material fact as it relates to whether the government was obligated under the Contract to provide a CSHA. *See Theisen Vending Co. v. United States*, 58 Fed. Cl. 195, 198 (2003) (stating that one of the prerequisites for a RCFC 56(d) motion is that the moving party must "explain how the results of the discovery are reasonably

expected to engender a genuine issue of material fact").[4] Since the Court finds the Contract to be unambiguous on the CSHA requirement, or, in the alternative, finds any ambiguity on the CSHA requirement to be patent, extrinsic evidence is not needed to resolve the government's motion for summary judgment. For this reason, Baldi's motion to continue the motion for summary judgment pursuant to RCFC 56(d) is denied as moot.

### B.      Motion to Strike

In its opposition, Baldi also introduced a sworn declaration of Michael Baldi, which speaks to his prior experience performing airfield paving projects at Travis AFB. *See* Baldi Decl. The government filed a motion to strike and requested that "the Court strike paragraph nos. 5 through 9 of the declaration of Mr. Baldi and disregard them during summary judgment proceedings." Mot. to Strike at 7. The government argues that Baldi failed to initially disclose, or to supplement its discovery responses, as required by RCFC 26(a) and (e). *Id*. at 1. The Court, however, finds that this motion is now moot. In ruling on the government's motion for summary judgment, the Court did not consider Mr. Baldi's declaration because it is extrinsic evidence, and both grounds for granting summary judgment are based on the plain language of the Contract. Additionally, the statements from Mr. Baldi's declaration may be used to resolve Baldi's remaining claims, and it would be futile to strike them now only to have them reintroduced. Accordingly, since the government asked the Court to "disregard [paragraphs 5 through 9 of Mr. Baldi's declaration] during summary judgment proceedings[,]" Mot. to Strike at 7, and the government's summary judgment motion is now resolved without consideration of Mr. Baldi's declaration, the government's motion to strike is denied as moot.

### C.      Motion to Stay Discovery and Motion to Compel

Because the Court resolves the government's outstanding motion for summary judgment, the government's motion to stay discovery is moot. Furthermore, since the Court treated the government's motion as a motion for partial summary judgment and did not fully dispose of Baldi's claims, Baldi's motion to compel is deferred until after the parties confer to discuss further proceedings in this case.

## IV.    CONCLUSIONS

For the reasons set forth above, the Court rules on the pending motions as follows:

- Defendant's Motion for Partial Summary Judgment is **GRANTED**;
- Plaintiff's Rule 56(d) is **DENIED AS MOOT**;
- Defendant's Motion to Strike is **DENIED AS MOOT;**
- Defendant's Motion to Stay Discovery is **DENIED AS MOOT**; and
- Plaintiff's Motion to Compel is **DEFERRED**.

---

[4] The Court in *Theisen Vending* analyzes RCFC 56(f), which was revised in 2011 to become RCFC 56(d) to reflect corresponding revisions to FRCP 56. *See* RCFC 56, Rules Committee Notes (2011 Amendment); *see also Clear Creek Cmty. Servs. Dist. v. United* States, 100 Fed. Cl. 78, 82 n.3 (2011).

The parties shall confer on further proceedings with respect to the remaining claims and on whether it will be necessary for the Court to rule on Plaintiff's motion to compel. The parties **SHALL** file a joint status report by **no later than December 3, 2021** with the results of such discussions. The Court will contact the parties to schedule a status conference after receipt of the joint status report.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge