# In the United States Court of Federal Claims

No. 16-536

(Filed: May 12, 2023)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| BALDI BROS, INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |

Motion for Summary Judgment; Constructive Suspension of Work; Constructive Change; Contract Interpretation.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*William J. Braun*, Braun & Melucci, LLP, La Jolla, CA, counsel for Plaintiff.

*Vijaya Surampudi*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant.

## OPINION AND ORDER

**DIETZ, Judge.**

Construction contractor Baldi Bros, Inc. ("Baldi") seeks compensation, pursuant to the Contract Disputes Act ("CDA"), for an alleged constructive suspension of work and constructive changes to its contract ("the Contract") with the United States Department of Navy ("Navy") for the removal and replacement of an aircraft ramp at Travis Air Force Base ("Travis AFB"). This dispute revolves around the contract requirements for handling and disposing of excess soil excavated at the project site. The Court previously ruled that the Contract did not require the Navy to provide a Clean Soil Holding Area ("CSHA") for Baldi's use on Travis AFB and that Baldi was required to haul excess soil off base. *See Baldi v. United States*, 156 Fed. Cl. 372, 383 (2021). That ruling disposed of Baldi's first cause of action. The government now argues that it is entitled to summary judgment on the constructive suspension of work and constructive change claims under Baldi's second cause of action.

For the reasons explained herein, the Court finds that there are no genuine issues of material fact with respect to Baldi's constructive suspension of work claim and, therefore, the government is entitled to judgment as a matter of law. However, the Court finds that there are genuine issues of material fact with respect to Baldi's claims that the Navy constructively changed the contract. Accordingly, the government's motion for partial summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**.

I.  **BACKGROUND**

This case stems from the Contract between Baldi and the Navy for the removal and replacement of an aircraft ramp at Travis AFB. Am. Compl. [ECF 18] ¶ 4; Def.'s App.[1] at 2-93.[2] The parties entered into the Contract, which had a value of $2,415,958, on December 17, 2012. [ECF 18] ¶ 4. The ramp replacement project called for "demolition of existing runway concrete, excavation of underlying soils, installation of new ramp pavement, storm drainage, under-drain system and incidental work[.]" *Id.* ¶ 5. The project required Baldi to excavate approximately 11,300 cubic yards of existing soil. *Id.* ¶ 6. Baldi completed the project on May 28, 2015—178 days after the completion deadline. *Id.* ¶ 22. As a result of the delayed completion, the Navy assessed liquidated damages against Baldi. *Id.* Baldi proceeded to file two claims with the Navy under the CDA, alleging constructive change and constructive suspension of work. *Id.* ¶¶ 26, 32.

In its first claim, which was filed with the Navy on November 13, 2015, Baldi sought $253,424.31. [ECF 18] ¶ 26. Baldi explained that it understood the Contract to require the government to provide Baldi with an on-base CSHA. *Id.* ¶ 24. When the government failed to provide one, Baldi sought compensation under Federal Acquisition Regulation ("FAR") 52.243-2, *Changes*, for its "increased direct costs of disposing of the contaminated soils off-base." *Id.* ¶ 26. The Navy Contracting Officer denied the claim on February 24, 2016. *Id.* Baldi filed its original complaint in this Court on May 2, 2016. Compl. [ECF 1]. Baldi's November 13, 2015, CDA claim was the basis of its first cause of action. *Id.* ¶¶ 5-25.

On January 30, 2017, Baldi filed its second claim with the Navy, seeking $563,424.00 for the "recission of the liquidated damages, a 178 day contract time extension, extended field overhead and general conditions, and under-absorbed home office overhead compensation under FAR 52.243-4, *Changes*." [ECF 18] ¶ 32 (alteration in original). Baldi's second claim was based on the following allegations: the Navy's refusal to provide a CSHA ("Allegation 1"), the Navy's constructive suspension of the work based upon its response to Baldi's Request for Information ("RFI") ("Allegation 2"), the Navy's constructive suspension of the work based upon its responses to Baldi's earthwork submittals ("Allegation 3"), the Navy's requirement that Baldi use a Soil Tracking Form and comply with the Travis AFB Soil Management Procedures Manual ("Allegation 4"), the Navy's requirement that additional soil testing be performed prior to hauling contaminated soils on base roads ("Allegation 5"), and the Navy's delay in issuing a signed manifest to allow for hauling of petroleum-contaminated soils on base ("Allegation 6"). *Id.* ¶ 31. Once more, the Navy Contracting Officer rejected Baldi's CDA claim. *Id.* ¶ 32. Thereafter, Baldi amended its complaint to add its January 30, 2017 CDA claim as the basis of its second cause of action. *Id.* ¶¶ 30-35.

On January 4, 2018, the government moved for summary judgment, arguing that the Contract does not require the government to provide Baldi with a CSHA and that this issue, if resolved in the government's favor, is dispositive of both causes of action alleged by Baldi. Def.'s Mot. for Summ. J. [ECF 26] at 1. On October 25, 2021, the Court granted the

---

[1] The Court cites to the Appendix filed by the government in support of its motion for summary judgment at [ECFs 78-1, 78-2, 78-3, 78-4 78-5, 78-6, 78-7, 78-8, and 78-9] as "Def.'s App. at __."

[2] All page numbers in the parties' filings refer to the page numbers generated by the CM/ECF system.

government's motion for partial summary judgment. *Baldi*, 156 Fed. Cl. at 375. The Court found that "the plain language of the Contract does not obligate the government to provide Baldi with a CSHA" and that "[t]he Contract is clear that there was no CSHA at Travis AFB at the time of contract formation and that the contractor was required to dispose of excess soil." *Id.* at 380. However, the Court disagreed that resolution of the CSHA issue—whether the Navy was obligated to provide Baldi with a CSHA—disposed of both causes of actions. The Court explained that the allegations underlying Baldi's second cause of action are arguably independent of the finding that the Navy had no obligation under the Contract to provide a CSHA and that further proceedings may be required to reach full resolution. *Id.* at 383-84. Accordingly, the Court ordered the parties to confer on further proceedings regarding Baldi's second cause of action. *Id.* at 385.

Following the Court's opinion, the parties filed a joint status report. [ECF 69]. Therein, the parties stated that they could not agree on further proceedings in this case. *Id*. After a status conference, the Court ordered the parties to meet and confer on which causes of action remained after the Court's opinion. Dec. 16, 2021, Order [ECF 71]. The parties filed another joint status report on January 7, 2022, stating that they agree that the Court's opinion "dispense[d] of [Allegation 1] contained in Baldi's second [cause] of action . . . but [that they] continue to disagree with the extent to which the Court's ruling affect[ed] the remaining allegations contained in the second cause of action and accordingly what discovery is relevant to the remaining allegations." [ECF 72] at 1. After considering the parties' positions, the Court ordered the government to file a motion for summary judgment addressing Allegations 2 through 6 of Baldi's second cause of action. [ECF 73, 75]. The government filed its motion for partial summary judgment on March 31, 2022, with respect to Allegations 2 through 5.[3] [ECF 78]. Baldi filed its opposition on May 1, 2022, [ECF 79], and the government filed its reply on June 17, 2022. [ECF 84]. The Court held oral argument on December 13, 2022. Scheduling Order [ECF 85].

## II.   LEGAL STANDARDS

Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC") provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought" and that "[t]he [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." An issue is genuine if it "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material if it will make a difference in the result of a case under the governing law. *Id.* at 248. Facts that are irrelevant or unnecessary will not preclude summary judgment. *Id.* at 247-48. The moving party bears the initial burden of demonstrating the absence of any genuine dispute of material fact; if satisfied, the burden shifts to the non-moving party to show that a genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The Court must draw all inferences from the underlying facts in the light most

---

[3] Allegations 1 and 6 are not disputed in the government's motion for partial summary judgment. Regarding Allegation 1, Baldi concedes that it should be dismissed based on the Court's prior ruling that the Navy was not required to provide a CSHA. [ECF 72]; [ECF 78] at 5; *see Baldi*, 156 Fed. Cl. at 383. Regarding Allegation 6, the government believes that "the Court would benefit from further record development on that issue[.]" [ECF 78] at 5.

favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the court must not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *accord Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."). The Court "must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law." *BES Design/Build, LLC v. United States*, 157 Fed. Cl. 241, 267 (2021) (citing *Anderson*, 477 U.S. at 250-52). If the record could not lead a rational trier of fact to find for the non-moving party, there is no need for the parties to undertake the time and expense of a trial because there is no genuine issue of material fact for trial, and the moving party should prevail without further proceedings. *Id.* at 268; *accord Matsushita*, 475 U.S. at 587.

### III. DISCUSSION

The government argues that summary judgment is appropriate as to Baldi's constructive suspension of work claims in Allegations 2 and 3, as well as Baldi's constructive change claims in Allegations 4 and 5, because they are "premised and rel[y] entirely on a finding that the Government was required to provide a CSHA[,]" and the Court previously ruled that the Navy was not obligated by the Contract to provide Baldi with a CSHA. [ECF 78] at 4-5. In its opposition, Baldi argues that there are material factual disputes related to "whether the government's actions and statements to [Baldi] that it was looking for a new CSHA site constructive[ly] suspended the work" and whether "the government's directives to [Baldi] to use the Travis Soils Management Procedures Plan and Soil Tracking Form as well [as] the delay in signing the form, along with its requirement for additional soil testing, constitutes a constructive change[.]" [ECF 79] at 9. The Court addresses the government's entitlement to summary judgment on these claims below.

#### A. Baldi's Constructive Suspension of Work Claims

In Allegations 2 and 3, Baldi alleges that the Navy's responses to its RFI and earthwork submittals resulted in a constructive suspension of work. A constructive suspension of work is "when work is stopped absent an express order by the contracting officer and the government is found to be responsible for the work stoppage." *P.R. Burke Corp. v. United States,* 277 F.3d 1346, 1359 (Fed. Cir. 2002). "A constructive suspension has the same effect and consequences as an actual suspension, and relief should be granted as if an actual suspension order had been issued." *Fruehauf Corp. v. United States,* 587 F.2d 486, 493-94 (Ct. Cl. 1978). For a contractor to recover costs because of a constructive suspension, the contractor must show that (1) the government directly caused the delay, (2) the delay was for an unreasonable period of time, and (3) the delay caused additional expenses or losses on the contractor. *Beauchamp Constr. Co. v. United States*, 14 Cl. Ct. 430, 437 (1988); *Wunderlich Contracting Co. v. United States*, 351 F.2d 956, 967-68 (Ct. Cl. 1966). When an equitable adjustment is being sought for government delay, "the contractor has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor." *Wilner v. United States,* 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc).

The government argues that Baldi "cannot prevail on a theory of constructive suspension of work because it has not and cannot demonstrate that any delay was caused by the [g]overnment." [ECF 84] at 9. The government explains that the Navy's responses to Baldi's RFI and earthwork submittals clearly state that the Contract does not require the Navy to provide a CSHA and that any change requires a contract modification. *Id*. The government further states that Baldi has not "demonstrate[d] that a contracting officer with authority to modify the contract's terms told [Baldi] to stop performing while it determined whether a CSHA could be provided through a modification." *Id*.

Baldi counters that "[t]he evidence reflects that[,] even if the government was not legally obligated to furnish a CSHA, its representations to [Baldi] were that it was looking for a new on-base CSHA site, and if found and used, it would issue a Modification to the Contract." [ECF 79] at 10. Baldi states that "[e]xporting excess soil thus was put on hold until the government informed Baldi of its decision whether to establish a new CSHA site." *Id*. Baldi asserts that these government communications, if reasonably relied upon, constitute a constructive suspension of work. *Id*. Baldi contends that material factual issues remain "as to the nature of these communications, whether [Baldi] was entitled to rely upon them, whether it did rely on them by stopping the earthwork, and whether they constitute a constructive suspension of the work." *Id*. at 13-14.

The Court finds that there are no genuine issues of material fact with respect to Baldi's constructive suspension claims in Allegations 2 and 3. The government does not dispute the Navy's communications that Baldi relies upon to support its constructive suspension of work claims. The parties dispute only whether such communications resulted in a constructive suspension of work by the Navy. Because the communications do not demonstrate that the Navy caused the delays, the Court finds that the communications do not result in a constructive suspension of work by the Navy and that the government is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

### 1. Baldi's Suspension of Work Claim Based on the Navy's RFI Response (Allegation 2)

Baldi claims that the Navy's response to Baldi's RFI No. 1240-08 caused a constructive suspension of work. [ECF 18] ¶ 31. On July 10, 2013, Baldi submitted RFI No. 1240-08, which stated:

> As noted in QC meeting of 7/3/13 soils with a green tint and odor of fuel were uncovered during removal of the existing concrete paving. Spec 02111 & Spec 02120 note the Travis AFB Clean Soil Holding Area. Please provide the location of the Travis AFB Clean Soil Holding Area where clean soil and petroleum only contaminated soil material is to be transported.

5

Def.'s App. at 95-96. On July 17, 2013, the Navy responded as follows:

> The Travis AFB Clean Soil Holding Area referred to in specs 02111 and 02120 is no longer in service. In accordance with Pre-award Amendment 5 Question 1, all excess soil shall be disposed of off-site. Excavation, handling, sampling, transportation and disposal of petroleum contaminated soil shall be in accordance with Spec 02111 and 02120. Survey, sampling and chemical analysis of soil shall be required to determine extent of contamination. Any fees associated with landfill charges for disposal of contaminated soil is understood to be an added cost, pending PCO.

*Id*. at 96. Baldi argues that the Navy's response "was not clear since [Baldi] already understood that the material would need to be disposed of 'off-site,' and the government was offering to pay the off-base 'landfill charges for disposal of contaminated soils.'" [ECF 79] at 11.

The Court finds that there is no genuine issue of material fact regarding whether the Navy's RFI response caused a constructive suspension of work because the Navy's response does not demonstrate that the Navy caused delay. The Navy's response to Baldi's RFI does not mention that the Navy was considering establishing a CSHA. To the contrary, it states that that the CSHA "is no longer in service" and that "all excess soil shall be disposed of off-site." Def.'s App. at 96. This response is consistent with the terms of the Contract, which did not require the Navy to provide Baldi with a CSHA. *See Baldi*, 156 Fed. Cl. at 380. Consequently, this response does not demonstrate a government-caused delay, as it does not instruct or otherwise imply that Baldi should suspend work while the Navy considers establishment of a CSHA.

Further, even if the Navy's response was unclear, this lack of clarity does not necessarily result in a government-caused delay. In other words, while the Navy's response is arguably vague on whether the costs for disposal of soil at an off-base landfill are covered under the Contract, it does not indicate that Baldi should suspend contract performance while the Navy considers whether to establish a CSHA. If Baldi considered the response to be unclear or otherwise disputed the Navy's response, Baldi should have sought clarification from the Navy and, while awaiting a response, continued performance under the Contract. *See CCM Corp. v. United States*, 20 Cl. Ct. 649, 658-59 (1990) (stating that, "under the "Disputes" clause of the contract, plaintiff was required to proceed with contract work even if it believed the government's actions were incorrect" and "plaintiff's failure to continue to perform was inexcusable.").

### 2. Baldi's Suspension of Work Claim Based on the Navy's Earthwork Submittal Responses (Allegation 3)

Baldi also claims that the Navy's responses to its earthwork submittals caused a constructive suspension of work. [ECF 18] ¶ 31. Under the Contract, Baldi was required to submit an earthwork plan, which was subject to approval by the Navy, that provided its approach for storing and disposing of unused satisfactory material. Def.'s App. at 60-61 (Section 02111.1.2); *Id.* at 87-88 (Section 02300.1.3). Baldi provided the Navy with its first earthwork

6

submittal on September 24, 2013. Pl.'s App.[4] at 24. Therein, Baldi stated that it "will dispose of satisfactory material, authorized to be wasted, in designated areas approved for surplus material storage or designated waste areas as directed." Def.'s App. at 104. The Navy rejected Baldi's first submittal on October 2, 2013, commenting as follows:

> Identify location for disposal of unused satisfactory material per Sec 02300 Para 1.3 Submittal requirements. There are no designated waste disposal or spoil areas on site. In accordance with Plan Sheet G-4 Note 9 and Amendment 5 question 1, all excess waste soil needs to be disposed [of] off site, whether satisfactory or unsatisfactory, contaminated or uncontaminated. Travis AFB does not have a pre-approved soil handling, staging, or containment area IAW Spec 01575 para 3.8.b. The Travis AFB Clean Soil Handling Area shown on original contract drawing G-4, and described in specifications 02111 and 02120, was specifically removed from the project site when plan sheet G-4 was revised via Amendment 4. Location for disposal meeting all aforementioned contract requirements needs to be addressed.

Pl.'s App. at 24. Shortly thereafter, on October 8, 2013, the Navy construction manager forwarded the Soil Management Procedures for Travis AFB to Baldi, which included "additional information on criteria required to obtain approval for transport of excess clean soil on base." *Id.* at 38. In the email, the Navy construction manager stated:

> The base is still investigating potential locations for clean soil disposal. However, in order to authorize transport, you will need to complete [a Soil Tracking Form] with soil characterization test data showing that soil meets criteria identified for clean soil. Otherwise, it will need to be taken to an offbase permitted disposal facility pursuant to the contract requirements.

*Id*. Baldi submitted its second earthwork submittal on October 30, 2013. Def.'s App. at 98. In its second submittal, Baldi again stated that it would use an a CSHA on Travis AFB for the disposal of excess soil. *Id*. at 131. On November 12, 2013, Baldi sent an email to the Navy construction manager stating Baldi's understanding that the Navy construction manager is "still waiting on or are expecting any day information from the Base on a location or potential location for the soil." Pl.'s App. at 61. The next day the Navy rejected Baldi's second submittal, stating that the Navy "take[s] exception to the assertion that satisfactory excess soil may be transported to a CSHA on Travis AFB without a formal modification or request for variation." Def.'s App. at 98. In its response, the Navy cited to various portions of the Contract in support of its position that it had no obligation to furnish Baldi with a CSHA and asserted that "[t]he contractor's assumption that a disposal site will be provided is neither expressly stated in nor supported by the contract documents." *Id.* Despite its contention that the Contract did not obligate the Navy to provide a CSHA, the Navy then stated the following:

---

[4] The Court cites to the Appendix filed by plaintiff in support of its opposition to the government's motion for summary judgment at [ECF 79-1] as "Pl.'s App. at __."

> Due to perceived benefit to the government and as a variation from contract requirements, an alternate location for excess soil disposal on government property is being considered. However, approval of an alternate CSHA location on government property is not guaranteed, cannot be authorized at this time, and will be contingent on a conformed contract modification. This does not relieve the contractor from responsibility per Sec 02300 Para 1.3 of identifying an acceptable location for disposal of unused material conforming to the aforementioned specifications.

*Id*. On December 18, 2013, the Navy sent Baldi a letter expressing concern about Baldi's lack of progress on the project. Pl.'s App. at 81. It also stated that "[t]he Government is further concerned about [Baldi's] failure to provide a satisfactory submittal for Earthwork (Specification 02300) within a timely manner[,]" and noted that Baldi's prior earthwork submittals were rejected due to failure to meet the Contract requirements requiring identification of a location for disposal of unused material. *Id*. Further, the Navy notified Baldi as follows: "[I]t is the position of our office that [Baldi] is contractually required to dispose of excess material at an offsite facility outside of Travis [AFB]. A disposal site will not be provided by the Government." *Id.* Lastly, it requested that Baldi provide a plan of corrective action and a revised schedule demonstrating how it intends to complete the project. *Id*.

Baldi responded to the Navy by letter on December 24, 2013. Pl.'s App. at 83. Baldi stated: "Baldi Bros. believes that this project is on stand-by until such time that the government designates a [CSHA] for Baldi Bros.' use, or in the alternative, issues a Request for Proposal (RFP) asking Baldi Bros for a price to haul off and dispose of petroleum contaminated soil to an off-base disposal site." *Id*. Baldi further stated:

> While Baldi Bros disagrees that disposal at CSHA is a variation of the contract requirements, the governments' consistent communications with Baldi Bros has been that the government was looking to establish an on-base CSHA for petroleum contaminated soils. Baldi Bros also agrees that based upon an estimated cost of $200,000 to $300,000 to dispose [of] petroleum contaminated soils off base, it would be in the best interest of the government to establish a CSHA . . . ."

*Id*. at 85. Baldi indicated: "As a result, Baldi Bros believe[s] that the earthwork on this project is constructively suspended until the government decides whether it will require additional soil testing in order to allow transport of excess soils and whether it intends to establish a new CSHA on-base." *Id*. Baldi added that it "require[d] a formal response from the government concerning either the new location of the on-base CSHA, or in the alternative, clear direction from the government that it [would] not be providing an on-base CSHA site." *Id*.

The government responded on January 21, 2014, informing Baldi that "the government [did] not have a CSHA and disposing of excess soil off-site along with required testing [was] the

8

responsibility of the contractor." App. to Def.'s Reply for First Mot. for Summ. J. [ECF 42-1] at 10. Based on this response from the Navy, Baldi provided its third earthwork submittal on February 4, 2014, which listed the Potrero Hills landfill as the off-base disposal location. *See* Def.'s App. at 108-113, 132. The Navy approved this earthwork submittal on February 5, 2014. *Id*. at 100, 132. Baldi commenced excavation and hauling of petroleum-contaminated soil to the Potrero Hills landfill on September 16, 2014 and completed all soil hauling by October 14, 2014. [ECF 18] ¶ 21. Baldi completed the project on May 28, 2015, 178 days after the completion deadline of December 1, 2014. *Id.* ¶ 22.

The Court finds that there are no genuine issues of material fact regarding whether the Navy's responses to Baldi's earthwork submittals caused a constructive suspension of work, because the Navy's responses do not demonstrate that the Navy caused delay. Baldi concedes that the Navy's response to Baldi's first earthwork submittal did not cause a constructive suspension of work because, as previously decided by the Court, the Navy was not required under the Contract to provide Baldi with a CSHA. *See* [ECF 79] at 9. Like the Navy's response to Baldi's RFI, the Navy's response to Baldi's first earthwork submittal makes no mention of the Navy potentially establishing a CSHA, and clearly states that "[t]here are no designated waste disposal or spoil areas on site" and that Baldi is required to dispose of "all excess waste soil . . . off site[.]" Pl.'s App. at 24. Additionally, because the Navy approved Baldi's third earthwork submittal, this submittal could not give rise to a claim of constructive suspension. *See* Def.'s App. at 100. This leaves the Navy's response to Baldi's second earthwork submittal as the only potential source of dispute.

The Navy's response to Baldi's second earthwork submittal states that "[d]ue to perceived benefit to the government and as a variation from contract requirements, an alternate location for excess soil disposal on government property is being considered." Def.'s App. at 98. While this response arguably lends support to Baldi's alleged rationale for suspending its disposal of excess soil, it does not suggest that Baldi should suspend work while the Navy considers establishing a CSHA. To the contrary, the response merely states that the Navy is *considering* establishing an on-base CSHA. It further explains that "approval of an alternate CSHA location on government property is not guaranteed, cannot be authorized at this time, and will be contingent on a conformed contract modification." *Id.* Significantly, the Navy also instructs Baldi that its response does not relieve Baldi of its contractual obligation to identify an acceptable location for disposal of excess soil. *Id.* The Navy's response is entirely consistent

with the Contract's requirements and is not sufficient by itself to demonstrate that the Navy caused the delay.[5][6]

### B. Baldi's Constructive Change Claims

In Allegations 4 and 5, Baldi alleges that the Navy constructively changed the Contract by requiring it to use a Soil Tracking Form and to perform additional soil testing. "A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government." *Kiewit Infrastructure W. Co. v. United States*, 972 F.3d 1322, 1329 (Fed. Cir. 2020) (quoting *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007). For a constructive change claim, a plaintiff "must show (1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government." *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014). When the government constructively changes a contract "the [g]overnment must fairly compensate the contractor for the costs of the change." *Aydin Corp. v. Windall*, 61 F.3d 1571, 1577 (Fed. Cir. 1995).

---

[5] In its opposition, Baldi attached a declaration from its project manager stating that "[t]he issue of whether the government would locate a new CSHA and issue a Modification to [Baldi's] contract arose . . . during project meetings" and that "[v]arious [c]ontracting [o]fficers and their representatives with authority to bind the government . . . attended these meetings." [ECF 79] at 25. Baldi's project manager also stated that "[a] government representative had actually identified to [Baldi's project manager] various potential locations for a new CSHA." *Id.* Baldi presumably provides these declarations to demonstrate that there are genuine issues of material fact with respect to the Navy's communications on the establishment of a CSHA and the authority of the representatives responsible for such communications. However, these declarations merely state that the issue of whether the Navy would establish a CSHA was raised during project meetings and that the project meetings were attended by authorized representatives of the Navy. The declarations do not indicate that the Navy stated that it was planning to establish a CSHA and that a modification would be forthcoming or that the Navy suggested that Baldi suspend performance while it considered whether to establish a CSHA. Further, these declarations do not state that an authorized representative of the Navy made or otherwise endorsed such statements or suggestions. *See P.R. Burke*, 277 F.3d at 1355 (finding no constructive suspension when the contractor did not demonstrate the contractor officer or someone with authority to bind the government authorized a stop in work). These declarations do not demonstrate a genuine issue as to whether the Navy caused the delay. *See id.* at 1354-55 (finding that a "stray statement from the terse minutes of [a] meeting . . . amounts to nothing more than a scintilla of evidence and that it cannot withstand summary judgment).

[6] The various communications Baldi relies upon to argue that the Navy constructively suspended its work under the Contract, even if viewed collectively, do not demonstrate that the Navy caused the delay. The Navy's RFI response, earthwork submittal responses, email communications, and alleged oral communications during project meetings demonstrate only that the Navy was *considering* establishment of a CSHA on Travis AFB. The communications also demonstrate that the establishment of a CSHA was contingent on the Navy issuing a contract modification. The communications did not prevent Baldi from continuing performance under the Contract by disposing of excess soil at an off-base facility, nor did they suggest that Baldi should suspend work under the Contract while the Navy considered whether to establish a CSHA. At a minimum, Baldi bears some responsibility for its decision to suspend its performance of work under the Contract without first obtaining direction from an authorized government official to do so. *Blinderman Const. Co. v. United States*; 695 F.2d 552, 559 (Fed. Cir. 1982) ("Where both parties contribute to the delay neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party." (internal quotation marks omitted)); *CCM Corp.*, 20 Cl. Ct. 649, 658–59 (finding that the contractor could not recover when it contributed to the delay).

10

The government argues that Allegations 4 and 5 should be dismissed because both "are inconsistent with the plain terms of the contract." [ECF 78] at 20. It argues that Baldi cannot prevail on its constructive change claim in Allegation 4 because "the contract requirements clearly establish that both the Soil Tracking Form and the Travis [AFB] Environmental Plan are required for performance." *Id.* at 21. Similarly, it argues that Baldi cannot prevail on its constructive change claim in Allegation 5 because "[t]he [C]ontract . . . clearly advises all contractors that testing is essential for all excavated soil." *Id*. at 22. (emphasis in original).

In its opposition, Baldi argues that the government has not demonstrated that these Allegations can be resolved solely by the Contract documents. [ECF 79] at 14-16. Rather, Baldi asserts that "[a] material factual dispute exists as to whether the Travis Soil Management Procedures Plan was part of the Contract [d]ocuments" that precludes granting summary judgment on Allegation 4. *Id.* at 15. Baldi further argues that summary judgment is not appropriate as to Allegation 5 because the additional testing was caused "by the discovery of heavy metals in the soil" and "the government's directive not to haul any soils on base until the soil had been tested for heavy metals was a constructive change to the [C]ontract." *Id*. at 12.

The Court finds that there are genuine issues of material fact that preclude summary judgment with respect to Baldi's constructive change claim in Allegation 4 because it is unclear whether the Soil Management Procedures Manual and Soil Tracking Form are incorporated into the Contract. With respect to Baldi's constructive change claim in Allegation 5, the Court finds that there are no genuine issues of material fact, and that the government is entitled to judgment as a matter of law because Baldi was required by the plain language of the Contract to perform the additional soil testing.

### 1. Baldi's Constructive Change Claim Based on the Soil Tracking Form and Travis AFB Soil Management Procedures Manual (Allegation 4)

Baldi claims that the Navy constructively changed the Contract by requiring Baldi to use a Soil Tracking Form and to comply with the Travis AFB Soil Procedures Manual. [ECF 18] ¶ 31. To demonstrate that the Soil Tracking Form and the Travis AFB Soil Management Procedures Manual were part of the Contract, the government points to a provision of the Contract that requires the contractor to "ensure that contractor personnel employed on the Project become familiar with and obey Travis [AFB] regulations." [ECF 78] at 21 (quoting Def.'s App. at 3 (Section 01140.1.1.2)). The government also points to a specification that provides: "Contractors are responsible for the analysis, characterization, and identification of all wastes generated by their operation.  Characterization and profiling shall be in accordance with Title 22 of the California Code of Regulations and the **Travis [AFB] Hazardous Waste Management Plan** and be subject to 60 CES/CEVC review." *Id.* (emphasis in original) (quoting Def.'s App. at 43 (Section 01575.1.8)).

The government asserts that "[t]he Base Soil Management Procedures Manual is incorporated into the Hazardous Waste Management Plan." [ECF 78] at 21. The government attached a copy of the Soil Management Procedures Manual as an appendix to its motion for summary judgement. *See* Def.'s App. at 147-54. Further, the government asserts that the manual expressly requires that the contractor "[s]ubmit a [Soil Tracking Form] . . . prior to transferring

11

clean or contaminated soil to any location other than the associated project site." *See id.* at 148. Since the manual is part of the Hazardous Waste Management Plan referenced in the Contract and the manual requires Baldi to use the Soil Tracking Form, the government contends that the Navy did not constructively change the contract by requiring Baldi to use the Soil Tracking Form. In its opposition, Baldi asserts that the government "has offered no evidence that the Travis Soil Management Procedures Plan was in fact a 'base regulation,'" [ECF 79] at 14, and that the government "continues to cite to a provision which is not part of the Contract [d]ocuments in support of its argument that compliance with the Travis Soil Management Procedures Plan was required," *id.* at 15.

Based on the evidence before the Court, it is impossible for the Court to determine whether the Soil Management Procedures Manual and the Soil Tracking Form are part of the Contract. The record evidence does not contain a complete copy of the Hazardous Waste Management Plan. Also, there is no evidence that demonstrates that the Soil Management Procedures Manual qualifies as a base regulation. In sum, because the Court cannot determine whether the Soil Management Procedures Manual and Soil Tracking Form are part of the Contract, there is a genuine issue of material fact that precludes summary judgment on Allegation 4.[7]

### 2. Baldi's Constructive Change Claim Based on the Additional Soil Testing Requirements (Allegation 5)

Baldi claims that the Navy constructively changed the Contract by requiring Baldi to conduct additional testing prior to hauling contaminated soils on base roads. [ECF 18] ¶ 31. The Contract specifications state that "[c]ontractors are responsible for the analysis, characterization, and identification of all wastes generated by their operation" and that "[c]haracterization and profiling shall be in accordance with . . . the Travis AFB Hazardous Waste Management Plan[.]" Def.'s App. at 43 (Section 01575.1.8). The Contract specifications further state that "[s]amples of excavated soil will be collected to determine suitability for disposal at the Travis AFB Clean Soil Holding Area or an offbase landfill." *Id.* at 64 (Section 02111.3.6.1). "Soil samples measuring less than 1 part per million-volume (ppmv) are considered clean and are acceptable at the CSHA without further testing." *Id.* (Section 02111.3.6.1). However, "[s]oil with contaminant levels that exceed the maximum acceptable concentrations shall be disposed at an offbase disposal facility" and "[a]nalyses for contaminated material to be taken to an offsite treatment, storage, or disposal (TSD) facility shall conform to local, state, and federal criteria as well as to the requirements of the TSD." *Id.* at 65. (Section 02111.3.6.1). The Contract also states that "[a]dditional sampling and analyses to the extent required by the approved offsite TSD facility shall be the responsibility of the Contractor and shall be performed at no additional cost to the [g]overnment." *Id.* (Section 02111.3.6.1).

---

[7] It is possible that the Hazardous Waste Management Plan sufficiently references the Soil Management Procedures Manual and Soil Tracking Form, such that these documents are incorporated into the Contract by reference. *See CSI Aviation, Inc. v. Dep't of Homeland Sec.*, 31 F.4th 1349, 1355 (Fed. Cir. 2022) (stating that incorporation by reference "provides a method for integrating material from various documents into a host document . . . by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein.") (alterations in original) (quoting *Zenon Env't, Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378 (Fed. Cir. 2007)). Further discovery is required for the Court to make this determination.

On October 31, 2013, Baldi submitted a Soil Tracking Form to the Navy indicating that "[a]ll results [from field screening] were less than 1 part per million" and that Baldi planned to transport excess soil to an "on base [CSHA.]" Def.'s App. at 124. As indicated in an email from Baldi's project manager to the Navy, the Navy rejected the Soil Tracking Form based on Baldi's field screening and instead required that Baldi perform laboratory analysis. Pl.'s App. at 52. In an email dated November 19, 2013, the Navy's construction manager stated:

> Per the Travis AFB Soil Management Procedures (3.9.6.3.2 and 3.9.6.3.3), soil analysis results from an independent, California certified laboratory are required to be provided for soil characterization. The base has confirmed that they are unable to process the Soil Tracking Form, and we are currently unable to consider a variation to allow soil to be transported on base, without the additional Lab Analysis. Please complete the analysis and resubmit the TAFB Form 124 for further processing.
>
> Otherwise, as we understand, disposal at an offsite TSD facility is required in accordance with contract specifications, including any sampling and analysis to the extent required by the facility. Note that since preliminary field screening seems to indicate that soil is clean, we do not believe that this situation will require a contract modification at this time.

*Id.* at 51. After receiving this response, Baldi used California Laboratory Services to conduct the soil testing, which occurred on April 15, 2014; June 27, 2014; and August 18, 2014. *See* Def.'s App. at 115-19.

Baldi argues that "[t]he Navy expressly cited to the Travis [AFB] Soil Management Procedures Plan, which had not been included with the Contract documents, as the basis for requiring . . . this additional testing." [ECF 79] at 15. The Soil Management Procedures referenced by the Navy state that the contractor must "[t]ransport the soil samples to a California certified laboratory for analysis" and "[o]btain a laboratory analysis report for each soil stockpile[.]" Pl.'s App. at 54-55. However, these requirements only appear in the Soil Management Procedures, not in the Contract. *See generally* Def.'s App. at 2-93. As discussed above, it is unclear if the Soil Management Procedures are part of the Contract. *See supra* Section III.B.1. Therefore, whether the Navy's direction to Baldi to obtain additional soil testing from a certified laboratory constituted a constructive change would hinge on whether the Soil Management Procedures are part of the Contract. This issue is irrelevant, however, because Baldi was required under the Contract to dispose of soil at an offsite disposal facility, and therefore, was also responsible for the cost of any additional soil analysis "to the extent required by the approved offsite TSD facility[.]" Def.'s App. at 65 (Section 02111.3.6.1). Baldi used the Potrero Hills Landfill to dispose of excess soil. *See id.* at 108-13. Under the Potrero Hills Waste Acceptance Guidelines, Potrero Hills required the submission of data from "a California certified analytical laboratory." *See id.* at 110. Thus, because the plain language of the Contract required that Baldi dispose of excess soil at an offsite disposal facility and pay for any additional testing required by the offsite facility, whether the Soil Management Procedures Plan was part of the

13

Contract is irrelevant. The government is entitled to judgment as a matter of law on Allegation 5. *Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002) (stating that "[w]hen the contract language is unambiguous on its face, our inquiry ends, and the plain language of the contract controls.").[8] [9]

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the government's partial motion for summary judgment. The Court **GRANTS** summary judgment with respect to: (i) Baldi's constructive suspension of work claims in Allegations 2 and 3 of Baldi's second cause of action in its amended complaint and (ii) Baldi's constructive change claim in Allegation 5 of Baldi's second cause of action in its amended complaint. The Court **DENIES** summary judgment with respect to Baldi's constructive change claim in Allegation 4 of Baldi's second cause of action in its amended complaint. The parties **SHALL** file a joint status report by **no later than May 26, 2023**, with a proposed schedule for further proceedings.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz<br>THOMPSON M. DIETZ, Judge

---

[8] Baldi's argument that the additional testing was necessitated "by the discovery of heavy metals in the soil" [ECF 79] at 17, is not persuasive because the discovery of heavy metals in the soil occurred after and as a result of the testing performed by California Laboratory Services, *see* Pl.'s App. at 27.

[9] Baldi also argues that "[t]he discovery of heavy metals in the soil was a differing site condition, and the government's directive not to haul any soils on base until the soil had been tested for heavy metals was a constructive change to the contract." [ECF 79] at 17. In response, the government contends that "Baldi did not claim a differing site condition in its pleadings as a cause of action, nor did it present such a claim to the contracting officer, as it must to establish jurisdiction in this Court, nor did it receive a final decision with respect to a differing site condition claim." [ECF 84] at 14. Outside of one reference to a change in site conditions in its amended complaint, *see* [ECF 18] ¶ 19, Baldi has not pled a claim for differing site conditions. Accordingly, the Court does not address Baldi's new claim for a differing site condition. *See Arrañaga v. United States*, 103 Fed. Cl. 465, 470 (2012) ("Put simply, there is a time and a place for everything: a new claim should be asserted by amending the complaint . . . not by responding to a summary judgment motion.") (citing RCFC 15)).